On Rehearing.
Monroe, J.
The death, in 1896, of Alphonse Levy, its president, led to the discovery that the plaintiff bank was in a condition of greafl financial embarrassment. Its capital was $50,000.00; the account of the commercial firm of J. Meyers & Oo., of which Levy was the managing partner, was overdrawn to the extent of $54,33*7.41, and that firm was not in a condition to make the overdraft good, though it was supposed, at that time, that its assets equalled, or exceeded its liabilities, and that the bank would eventually recover a large proportion, if not the whole, of its claim. In the meanwhile, however, it was necessary that something should be done to tide over the immediate trouble; and two measures of relief were adopted, to-wit: {A petition was presented to the District Court by several large creditors of J. Meyers & Co., including the bank, praying for the appointment of liquidators, and also praying that! the liquidators so appointed be authorized to advance, to the bank, $10,000.00, on account of the dividend which it was believed would eventually be declared in its favor. In these prayers, Julius Meyers, the surviving partner, who was also a director of the bank, and several creditors of the firm, other than the petitioners, joined, and the order was made accordingly. In addition to this, an agreement was entered into between the directors of the bank which reads as follows:
“We, the undersigned members of the Board of Directors of the St. “ Landry State Bank, hereby agree to deposit in said bank, this day, the “respective amounts opposite our names, and to maintain and leave “ said deposits in said bank for the space of twelve months from date, “ unless, in the opinion of the majority of the Board of Directors, the “ financial condition of the bank shall be such, as to allow said deposit- *1781 “ ors, from time to time, within said twelve months, to withdraw, either “ a portion, or the whole, of their aforesaid, respective deposits.
“E. 11. Boagni, two thousand dollars ($2,000.00).
“J. T. Stewart, two thousand dollars ($2,000.00).
“I. M. Lichtenstein, two thousand dollars .($2,000.00).
“Ant. Dietlein, two thousand dollars ($2,000.00).
“Julius Meyers, five thousand dollars ($5,000.00).
And, this agreement having been carried into effect, each of the depositors received a certificate, reading, save as to the name and amount “Julius Meyers has deposited in this bank “five thousand “ dollars, payable, subject to conditions (see agreement) in current “ funds, on the return of this certificate.
(Signed) “Fritz Dietlein, Cashier.”
The bank also received, from Julius Meyers, a further sum of five thousand dollars, which was paid on account of the purchase by him of a pro rata interest in the claim of the bank against his late firm, so that the bank had received, by March 12, 1896, from these different sources, an aggregate of $28,000.00, to which is to be added a small amount, otherwise obtained through the liquidators; and, Mr. E. M. Boagni having succeeded Mr. Levy as president, the doors of the bank were kept open.
The liquidators appointed by the court were ITenry Newman, a creditor residing in New Orleans, J. T. Stewart, a director in the plaintiff bank, and Julius Meyers, the surviving partner. The latter gentleman took no active part in the liquidation, Mr. Newman was represented by Mr. J. R. Norman, who was sent from New Orleans for that purpose, and who, with Mr. Stewart, conducted the liquidation. Within a short time, the liquidators and some of the creditors were engaged in negotiations with certain persons, who, apparently, contemplated buying the outstanding claims against J. Meyers & Oo., and we find, in the record, the following letters — the one from Mr. Saunders of the New Orleans bar, addressed to Mr. Boagni, president of the plaintiff bank, and the other, the reply thereto. Mr. Saunders writes:
“June 17, 1896.
“Yours of recent date, regarding agreement of Iiiller and Newman “ to share the responsibility reed. The desired, and promised agree *1782 “ment will be prepared and forwarded. Mr. Upton says, that, if the “ St. Landry Bank will agree to accept 35 per cent, on the face of its “ debt, keeping, besides, what has already been paid to it, he believes “ that the creditors can be settled with at 35 per cent, .on the face of “ their claims. I am satisfied that this offer will be made — if the bank “ will accept. Please let us know, at once, whether the bank will settle “ on the terms proposed. If it will, Mr. Roos will come up at once. “ An immediate reply will greatly oblige us all.
“(Signed) E. D. Saunders."
Mr. Saunders, at that time was representing the liquidators, as their attorney, and had no interest in the persons who proposed to make the offer to which he refers, though exactly whom he was representing does not appear to have been very definitely .known to his correspondent. Mr. Boagni’s reply is dated June.19th, and reads as follows:
“Replying to your valued favor of the 17th inst., I beg to say that “ bank would, for immediate settlement of the J. Meyers & Co. claim, “ accept 35 per cent, on the face of its claim, not taking into account, “ nor being held to account for, money already received.
“(Signed) E. M. Boagni, Pres, etc.”
It requires rather close observation to detect a difference between the terms of the offer, such as it is, as made by Mr. Saunders, and the terms of the acceptance by Mr. Boagni. It may be discovered, however, that Mr. Saunders writes “If the St. Landry State Bank “will agree to accept 35 per cent, on the face of its debt, “ keeping, besides, what has been paid to it,” etc., whereas “ Mr. Boagni replies “that bank would, for immediate settle“ment of the J. Meyers & Co. claim, accept 35 per cent, on the a face of its claim, not taking- into account, nor being held to account “for, money already received." Mr. Saunders understood that the acceptance was in accordance with the terms of the offer, and he so informed the people interested. Mr. Boagni claims that it was intended as modifying the terms of the offer, and was, in effect, a counter proposition, the purpose of which was, by the use of the word received, instead of the word paid, as used by Mr. Saunders, to include, in the amounts for which the bank was not to account, not only the $10,000.00 received from the liquidators, and the $5,000.00 received from Meyers, in payment, but also the $5,000.00 which Meyers, in common with the *1783 other directors, had deposited in, and loaned to, the bank. He says, in his testimony, speaking to Mr. Saunders, “I meant that to make a “ proposition that we were not to pay back money that was paid to us.” Being asked by Mr. Saunders “Did you at any time, state to me, either “ in writing or verbally, that your acceptance was different from my “ proposition ?” He answered “no sir, not to my recollection.”
M. Stewart, being interrogated by Mr. Saunders, upon the same subject, gives the folio-wing testimony: Questions by Mr. Saunders: “Then I understand you to say that the directors intended to submit a “different proposition from the one I submitted? ‘Yes, sir.’ Did the “ directors intend to call my attention, or the attention of any one else, “ to the difference between the propositions made by me, and the proposition th'ey made? A. They made a different one. Q. Did they “ intend to call my attention to the fact that my proposition was differ- “ ent from theirs ? A. They thought that you might be able to dis- “ tinguish the difference.”
Following the exchange of letters, between Saunders and Boagni, Mr. Henry Roos, Sr., of New' Orleans, being one of the parties to whom the said letters referred, went to Opelousas with a view to looking into the affairs of J. Meyers & Oo. and of determining whether he and his associates would make the offer which had been thus suggested as likely to be made, but he returned home without having taken any definite action in the matter.
In the meantime, the negotiations appear to have made some progress, and, upon January 26th, Mr. Boagni, for the bank, wrote to the liquidators:
“Gentlemen — In the matter of action in the J. Meyers & Oo. affair, “ as agreed, delay expires to-morrow. I wish to be informed as to “results of investigations of Mr. Henry Roos, et al. We intend to “ proceed, unless something tangible is presented.
“(Signed) E. M. Boagni, President.”
This letter reached the liquidators the day before Mr. Roos’ departure, and its contents were made known to him, and the next day, as he was leaving to return to New Orleans, the liquidators handed him a letter, to the following effect:
*1784 “Mr. Henry Boos — ■
“We are in receipt of a communication from the St. Landry State “ Bank, dated the 26th inst. (of) the contents of which you are fully “ aware, and which forces us to ask of you information, which must be “ definite, as to the result of your investigations here into the affairs “ of J. Meyers & Co., in liquidation, which was made with the view of a “ settlement of the said business, so mentioned between us. In the “ event that you see proper to accept the settlement proposed, that said “ proposition must be in writing, and a duplicate one to be delivered to “ Mr. Saunders, or the other mailed to us here, and that no proposi- “ tion will be entertained unless, accompanied by certified check for “ $5,000.00, as a guarantee of good faith on part of would-be purchasers, “ subject to withdrawal provided the deal is not consummated. You “must also understand that no proposition for less than the contem- “ plated settlement will be entertained.
“(Signed) II. Newman, per Norman,
“J. T. Stewart,

“Liquidators of J. Meyers & Qo.”

Some delay seems to have ensued after the writing of this letter, but, upon July 30th, Isaac Roos, who was associated with Henry Roos, Sr., in the proposed investment, went to Opelousas, from New Orleans, taking with him the skeleton of a projet of an agreement, which had been prepared by Mr. Saunders, and was to be completed and signed by him, for himself and associates, and by the St, Landry Bank, on its own behalf, for the purchase, by Roos & Co., of the claims of the bank against J. Meyers & Co. in liquidation. There can be no doubt, we think, that Roos’ understanding, at that time, derived from Saunders, was, that the bank for the purpose of the trade, or settlement, which was to be made, was to hold on to the $10,000.00, which had been paid to it by the liquidators, and to the $5,000.00, which had been paid by Julius Meyers, but the $5,000.00 which had been deposited, and loaned, by Meyers did not enter into his calculations. His associates in the matter were Henry Roos, Sr., who is a brother-in-law of Julius Meyers, Isidore Silverburg, a nephew of Meyers, and Nathan F. Roos, and Henry Roos, Jr., nephews of Meyers’ wife. The purpose of the associates was to acquire all outstanding claims against J. Meyers & Co., and re-establish, and carry on, by means of a mercantile company, composed *1785 of themselves, the business which had been conducted by that firm. The meeting between the parties, that is to say, Isaac Roos, representing himself and his associates, and Mr. Boagni, and others, representing the bank, took place at the bank, on July 31st, and resulted in a contract, in the following terms, to-wit:
“Opelousas, La., July 31, 1898.
“For value received, the St. Landry State Bank of Opelousas, “ through E. M. Boagni, its president, and pursuant to a resolution of “ its Board of Directors (a copy of which is hereto attached), hereby “ sells, assigns, transfers, and delivers, unto Isaac Roos, Henry Roos, “ Sr., Isadore Silverburg, Nathan F. Roos, and Henry Roos, Jr., all of “ its claim, for fifty-four thousand, three hundred and thirty-seven “46-100 dollars ($54,387.46), against the firm of J. Meyers & Co., of “ Opelousas, La. (being the amount due said bank by said firm), fully “ subrogating said Isaac Roos to all its rights and actions on said “ claim, to be exercised and enforced by them as fully as they might “have been by said bank but for this transfer, salé and assignment. “It is understood and agreed that this transfer is made without recourse “ on us (that we are not to pay, or to be held to account for, money “received from the liquidators, or from Julius Meyers; this does not “ include the $8,044.81, now on deposit in this bank for account of the “ liquidators).
“That six thousand, three hundred and thirty-nine and 37-100 dol- “ lars to be paid in cash. That six thousand, three hundred and thirty-“nine 37-100 dollars to be paid on or before twelve months from the “date of this agreement. And that six thousand, three hundred and “ thirty-nine 37-100 dollars to be paid on or before twenty-four months “ from the date of this agreement. The deferred two payments to be “ evidenced by notes, signed by Isaac Roos, Henry Roos, Sr., Isadore “ Silverburg, Nathan F. Roos, and Henry Roos, Jr., and to be indorsed “ by the stock company to be formed, said notes to bear six per cent. “ interest from date, and attorney’s fees to be fixed at ten per cent., in “ case of suit to enforce payment.
“I will not assert nor attempt to enforce against the firm of J. “ Meyers & Oo., nor against the liquidators, or members thereof, or their “ estates, any claim or liability, whatever, arising from, or growing out “ of, the indorsement by said J. Meyers & Oo. or by said members *1786 “thereof, as indorsers, or sureties of any notes held or owned by us, “ however acquired.
“(Signed) St. Landry State Bank,
E. M. Bokom,¿President.
“(Signed) Isaac Roos and Associates."
It appears that the type-written projet, prepared by Mr. Saunders, contained only the first and last clauses, as they appear in this contract, i. e., the clause beginning “for value received,” and ending “sale and assignment;” and the clause beginning “I will not assert,” and ending “however acquired;” and that the other clauses, those out of which this litigation has arisen were inserted by the representatives of the bank; the words, “this does not include the $8,044.61 now on “ deposit in this ba^ik for account of the liquidators,” being added just before the instrument was signed, at the suggestion of Mr. Roos, and for the reason that the account thus mentioned had been collected in the course of the liquidation of the firm of I. Meyers & Co., and deposited in the bank by the liquidators, and it was thought best to make it perfectly clear that it was not to be retained by the bank, as money which it had received from the liquidators, in the sense in which it had received the $10,000.00. Several persons were present during the completion and signing of the contract, and, from their testimony, it does not appear that the ñame of Julius Meyers was mentioned, or that anything was said about the certificate which had been issued to him for the $'5,000.00 deposited, and which was attempted to be seized at the inception of the suit. The evidence shows that Meyers had given to Isaac Roos his power of attorney to act in his place as liquidator, but the instrument was strictly confined to that subject. It is also shown that Roos represented Meyers, that is to say, he consulted with Meyers’ attorney, etc., in connection with a criminal prosecution which had been instituted against him, growing out of the relations of his firm with the bank. Several of the witnesses for the plaintiff testify, also, that they were under the impression that Roos was authorized to represent Meyers, generally, but no one states that either Meyers or Roos ever said so, nor is there any evidence that Roos acted for Meyers at any time, except .in-the matters mentioned above, and one other, to-wit: the day following the signing of the contract, Roos spoke to Boagni about the claim of a Mr. Andrus against J. Meyers & Co., asking whether *1787 said claim, or-part of it, could not be paid from the $5,000.00 which Meyers had deposited in the bank; and he testifies that Meyers had authorized him to do so. He also says that Boagni said that he would see about it, or something of that kind; and'¿Boagni testifies in substance, that he was so much surprised at the proposition that he had nothing to say. On that same day, August 1, the stipulations of the contract were carried out in so far as that the cash payment was made and the notes were signed by all the associates except two, whose signatures were not very important, financially, and were obtained after-wards; and a receipt was written across the face of the duplicate, in possession of the associates, in the following terms:
“Received payment as per this agreement; Opelousas, La., Aug. 1st, “ 189C. (Signed) E. M. Boagni, President.”
Nothing, whatever, was said at the time of the payment thus made and of the delivery of the notes, and the signing of the receipt, concerning the $5,000.00 deposit of Julius Meyers, or about the certificate which had been given (herefor. Boagni testifies that, at some other time, later on, he spoke to Isaac Roos about the certificate, and that Roos promised to deliver it, but Roos, categorically and emphatically, denies this statement, and it is conclusively shown that, about August 15th, Boagni, Roos, Saunders, Norman and Baillio were present in the bank, for the purpose of settling another matter, and that, upon Boagni’s speaking of the bank’s having a claim to said certificate, Roos exhibited great surprise and asked him why he had never spoken of it before.
It may be remarked, in concluding this statement of the ease, that Mr. Upton, whose name is mentioned in Mr. Saunders’ letter, is shown to have been the attorney of Julius Meyers, and also the attorney of Henry Roos, Sr., but there is no specific testimony as to whom he professed to represent in making the statement to which Mr. Saunders refers. The only direct evidence, however, as to any interest of Julius Meyers in the contract out of which the case arises, is to the effect that he has, absolutely, no interest whatever.
The judge of the lower court held that the evidence did not justify the conclusion that Roos acted as the agent of Meyers, or that he was authorized to do so, and hence, that Meyers’ certificate, and his deposit, could not be considered as affected by the contract of July 31st. But he, also, held that said contract called for the $5,000.00, and that *1788 as Roos and his associates had failed to show Meyers’ authority they were bound, personally, and he gave judgment accordingly; and, from that judgment, Roos and his associates appealed. Upon the former hearing, in this court, the conclusion was reached that Roos had acted with the authority of Meyers, or in his behalf, and that the contract entitled the bank to the certificate, and there was judgment on that basis.
Opinion.
The fact that the defendants in this case are the brother-in-law, and the nephew, and nephews-in-law, of Julius Meyers, has very little significance for the purposes of the question which is to be decided; since it must be admitted, by any reasonable mind, that, whilst they might have been, and might now be, acting for Meyers, and with Meyers’ money, it is just as likely, as an abstract proposition, that they might have been, and might'now be, acting entirely for themselves, and with their own money. Seeking for information in other directions, we find that only two witnesses, Roos and Silverburg, testify directly upon the subject of Meyers’ supposed interest in the purchase of the bank’s claim and in the operations of the Mercantile Company, to which that claim was evidently transferred, and they both swear positively, that he had, and has, no interest in either.
If we, then, appeal to the surrounding circumstances, the theory that it is Meyers, acting through his family connections who is the real party in interest, is equally without support, for there is not a circumstance, disclosed by the evidence, which can be said to make that theory even probable, still less to sustain it.
Alphonse Levy, Meyers’ partner, took his own life, in February, 1896, and left the affairs of the firm, of which he was the acting, managing, partner, as well as of the bank, of which he was president, in a condition of the utmost confusion. It is hardly to be supposed, that if the money which he had obtained from the bank had been still in his possession, or in that of his firm, he would have been driven to such a desperate extremity, and there is no evidence in the record to indicate that the trouble which he sought to escape was not greater than he believed that he could endure. His sudden taking off, necessarily, left the burden on the shoulders of the partner, who survived, and it does not require a vivid imagination to enable one to understand that the *1789 position of that partner was not a pleasant one. It was his firm, carrying' his name, which had been wrecked and dishonered, and it was he who lived to be called to account, by wronged and indignant creditors, not only civilly, but in the criminal courts of the community in which he had been a prominent merchant and citizen. This present suit was instituted in February, 1897, about a year after the deplorable occurrence which has been mentioned, and the trial, in the District Oourt, took place some months later. Liquidators, representing creditors for over $100,000.00, had in the meanwhile been placed in charge of the affairs of the late firm, and it may readily be supposed that they had informed themselves fully concerning those affairs, and that the acts and doings of Julius Meyers had not escaped their attention. The president of the plaintiff bank has said, in his testimony, “I prosecuted Mr. Julius Meyers, prosecuted him criminally;” so that nothing of value, left in the Opelousas business of J. Meyers & co., was likely to have been overlooked; and, if the circumstances under which that business has since been carried on had been such as to indicate that it was conducted for the benefit of Julius Meyer, it seems probable that we should have heard of it through the transcript. But the facts shown are, that Julius Meyers has left Opelousas and is living in New Orleans; that other men have established, and are conducting, under the name of the “Opelousas Mercantile Company,” a business which has succeeded that of which he was the owner, and there is nothing- to indicate that they are not, financially, and otherwise, perfectly competent to conduct such a business for their own account, or that they are philantrophists, !who had rather devote their energies to working for an uncle, or uncle-in-law, than to the pushing of their own fortunes. When we proceed further, and reach the immediate facts with which we have to- deal, we find that, very soon after the condition of affairs was ascertained, negotiations of some kind were begun, looking to the purchase of the outstanding claims against J. Meyers & Co., and the only suggestion, which, in the remotest degree, connects Julius Meyers with those negotiations is, that Mr. Upton, who is mentioned in Mr. Saunders’ letter, is shown to have been Meyers’ attorney. But Mr. Upton was also the attorney of Mr. Henry Roos, Sr., Meyers’ brother-in-law, and it was Henry Roos, Sr., and his associates who were contemplating making the purchase. It was he who visited Opelousas and examined into the affairs of J. Meyers & Co. with that view, and it was *1790 lie, of whom Boagni wrote to the liquidators, saying, that he wanted to be informed of the results of his examination, and insisted that he should make something definite in the way of a proposition. And the proposition came — not from Julius Meyers, or from any one pretending to represent him, but from Roos and his associates, who were, dealt with, by the bank, as responsible men, acting for themselves. The contract was made in their name, and they paid the cash and gave the notes called for by it. And whatever ambiguity, in other respects, there may be in the language used, that language suggests no doubt as to who the contracting parties were.
Isaac Roos swears that he was not the agent of Meyers in the matter, and there is no witness who swears that he was, or who can point to any cricumstance, or combination of circumstances, leading to that conclusion. The provision of the contract, whereby the bank agreed not to hold J. Meyers & Company, or the members of that firm, on any indorsements owned by it, was simply part of the understanding, that the bank was selling all of its claim which made it certain that it was not to compete with its vendees in the discussion of the debtors’ property. But, suppose that Isaac Roos held Meyers’ full and unreserved power of attorney on the 31st of July, it surely will not be contended that he could dispose of, or did dispose of, $5,000 of his principal's money, by virtue of a carefully worded, written, contract, in which nothing of that kind is made to appear, but which, upon the contrary, declares in specific terms, that he is acting for himself and certain other named persons; and the consideration of which inures to him and to those persons, and not to Meyers.
In order, therefore, to justify a judgment which will appropriate the $5,000 in question, belonging to Meyers, for the purposes of the contract between the bank and Roos and company, we must first determine that Meyers is a party to, and beneficiary in, that contract, and then go a step farther and determine that, as between him and Roos and company, the $5,000 is his just, or his agreed, proportion of the price which they were paying the bank. And neither proposition is established by the evidence, nor can it be said that there is even an attempt to establish either of them. In addition to these considerations, it may be said that, if Julius Meyers had felt disposed to take up again the broken and tangled thread of his business life in Opelousas, there would seem to have been nothing to have prevented-him from making the *1791 offer, of 35 cents on the dollar, to his creditors, in his own name, if the theory of the plaintiff, that it was his money which was used, be correct. Why then should he have resorted to the complicated, and circuitous method which is attributed to him?
Proceeding further with the inquiry: If Julius Meyers was not one of the beneficiaries of the contract between the bank and Roos & Company, was it not perfectly apparent to the bank that his $5,000 could not be used for the purposes of that contract ? Is it not a difficult proposition to maintain, that the bank was deceived in this matter, and led into the belief that Roos & Company were turning over to it Meyers’ $5,000 deposit, when it is not even claimed that Roos & Co. were pretending to act by the authority of Meyers ? If there is anything of which the record is absolutely bare, it is both allegation and proof that Roos, acting for himself and associates, at any time, or to any body, asserted, or pretended, that he was also acting for Meyers. It is alleged that he was, in point of fact, Meyers’ agent, but, as we have seen, the proof fails to establish it; and it appears, affirmatively, upon the face of the contrac!) sued on, that it was not entered into by him in that capacity. But it is not even alleged, still less proved, that he claimed to be the agent of Meyers. On the contrary, the witnesses all agree that, during the time when the contract was being completed and signed, neither Meyers’ name, nor his deposit, nor his certificate of deposit, were mentioned. The bank, therefore, is in 'the position of holding in its possession, on deposit for the account of Julius Meyers, the sum of $5,000, for which its certificate is outstanding; and of claiming the ownership of said sum, by virtue of a contract made with some other parties, in their own names, and for their own benefit, upon the ground that such persons were the agents of Meyers, though it is not alleged that they acted as such in the making of the contract, and the contract itself shows the contrary; or, that contention failing, it claiims that such persons undertook, without pretending to be the agents of Meyers, to dispose of his money, and, being without authority, are personally liable.
If Roos had gone into the Opelousas bank to buy a draft on New' York for $5,000 and had offered, in payment, a deposit, then in the bank to the credit of Meyers, he would have been asked for his authority thus to make use of money belonging to another person, and if he failed to produce it the bank would have refused to furnish the draft. *1792 But we are told, in this case, that the bank gave value to Roos upon his undertaking to furnish the consideration in that way, and not only was he not asked for his authority, but the instrument in writing, by virtue of which he obtained the value, declared, upon its face, that he was giving and taking only upon his own account.
But, finally, did Roos and his associates undertake to dispose of Meyers’ $5,000 deposit, and did the bank do the incredible thing of parting with any value by reason of such an undertaking? We think that both of these questions must be answered in the negative. Whatever may have been the idea of the officers of the bank in substituting the word received for the word paid, in the correspondence with Saunders, that idea was never conveyed to him by the substitution, nor would it have been conveyed to any, except an uncommonly suspicious, mind. And the same thing may be said of the language of the contract. Roos had gone to Opelousas with a distinct understanding of the contract that he was to make, and the language written into it by the bank, after he reached there, was readily susceptible of an interpretation in accordance with that understanding; and he therefore signed the instrument.
The word received, as applied, in that instrument, to money which the bank had obtained from Meyers, is certainly susceptible of two meanings, and Roos was justified in supposing that it was used in the sense which made it applicable to the subject with which he was dealing, rather than to a matter, with which he was claiming no authority to deal, and with which the bank knew that he could not deal, without the express and disclosed authority of Meyers.
The subject of the contract was the claim of the bank against J. Meyers & Company, which the bank was to sell to Roos. But the bank had been “paid”, or had “received” $10,125 from the liquidators, and $5,000 from Meyers, on account of that claim, and it was part of the bargain, that the money so paid and received should not be refunded, and yet, that the bank should get 35 per cení, on its claim, as though no such payments had been made, and the words “money received from the liquidators, or from Julius Meyers”, were used to express that idea, and to protect the bank against being called on to refund the price of a thing which it would, otherwise, have appeared to be selling twice. There was no occasion to apply them to the $5,000 which Meyers had deposited, since that was a matter between Meyers and tho bank and in no manner affected the claim that Roos was buying. It occurred to *1793 Roos that, perhaps, the $8,044.61, which the liquidators of J. Meyers & Company had on 'deposit, might be involved, and he mentioned it, and had some words inserted in the contract respecting it. He was interested in doing so, just as he was interested in the provision to the effect that the bank should make no claim on 'the indorsements of J. Meyers & Company which it might hold; the only difference being, that, in the case of the money, if the liquidators retained it, they would use it to pay debts which would otherwise compete with the claim that he was buying; and, in the matter of the indorsements his agreement prevented them from competing with that claim.
It is true, no doubt, that 'the deposit was money which the bank had “received” from Julius Meyers, but it had. been received in reality as a sort of a loan, and had not been received in the relative sense in which that word was. used in the contract. It would be as reasonable to say of an agent who has been appointed to take charge of a particular business, and whose contract happens to provide that he shall account for, or deposit, all money received; that he should deposit a legacy received from the estate of his father, or money received, on his own account, from any other source, simply because it falls within the’ literalism of the word “received.”
We are, therefore, of opinion 'that the judgment appealed from is erroneous, in holding the defendants liable; and it is, accordingly, ordered, adjudged, and decreed that said judgment be annulled, avoided and reversed, in so far as it condemns Isaac Roos and his associates, and affirmed, in so far as it rejects the demand as against Julius Meyers.
And it is further ordered, adjudged and decreed that the demand herein made, as against Isaac Roos, Henry Roos, Sr., Henry Roos, Jr., Nathan E. Roos, and Isidore Silverberg, be rejected, and plaintiff’s suit be dismissed; plaintiff to pay all costs.
Nici-iolls, C. J., and Breaux, J., concur, for reasons assigned in separate opinions.
Watkins, J., and Blanchard, J., dissent, adhering to the original opinion.